PROBER & RAPHAEL, A LAW CORPORATION
DEAN R. PROBER, ESQUIRE, #106207
LEE S. RAPHAEL, ESQUIRE, #180030
CASSANDRA J. RICHEY, ESQUIRE #155721
20750 Ventura Boulevard, Suite 100
P. O. Box 4365
Woodland Hills, California 91365-4365
(818) 227-0100
B.500-879
Attorneys for Secured Creditor


UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII (HONOLULU)

| | |
|---|---|
| In re | ) Bk. No. 11-00098 |
| | ) |
| JOHN DEHART WOLLSTEIN, | ) |
| | ) CHAPTER 11 |
| Debtor. | ) |
| | ) |

NOTICE OF SECURITY INTEREST IN RENTS AND PROFITS

TO DEBTOR, HIS ATTORNEY AND ALL INTERESTED PARTIES:

NOTICE IS HEREBY GIVEN pursuant to 11 U.S.C. §§ 552(b) and 546(b) of the

Bankruptcy Code that BAC Home Loans Servicing, LP, its assignees and/or successors in

interest, has a security interest in the rents and profits in that certain real property commonly

known as **91-005 Parish Drive, Ewa Beach, Hawaii**.

Said security interest arises from a Promissory Note and Mortgage dated July 19,

2007 in the original amount of $76,000.00. A copy of the Note and Mortgage is attached hereto

as **Exhibit "A"** and is incorporated herein by this reference.

NOTICE IS HEREBY GIVEN that pursuant to Bankruptcy Code § 546(b), BAC

Home Loans Servicing, LP, its assignees and/or successors in interest, hereby claims a perfected

security interest in rents, issues and profits of the afore-described subject property.

NOTICE IS ALSO GIVEN that as a result of this Notice of Perfection under

1

§546(b) concerning the rents, issues and profits from the subject Property, that all rents, issues and profits generated hereafter from the afore-described real property are deemed cash collateral as defined under 11 U.S.C. § 363(a) and are subject to the perfected security interest held by BAC Home Loans Servicing, LP, its assignees and/or successors in interest.

NOTICE IS HEREBY GIVEN that said cash collateral must be segregated and separately accounted for pursuant to Bankruptcy Code § 363(c)(4).

NOTICE IS FURTHER GIVEN that BAC Home Loans Servicing, LP, its assignees and/or successors in interest, does not consent to the use of their cash collateral and hereby demands that such funds generated from the subject real property be segregated and separately accounted for as required by law and turned over to BAC Home Loans Servicing, LP, its assignees and/or successors in interest.

Dated: April 19, 2011                         Prober & Raphael, A Law Corporation


                                              /s/ Dean R. Prober, Esq.
                                              DEAN R. PROBER, ESQUIRE, #106207

2

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

      I,Tina Gabyan, certify that I am a resident of the County aforesaid; I am over the age of 18 years and not a party to the within action; my business address is 20750 Ventura Boulevard, Suite 100, Woodland Hills, California 91364.

      On  April 20, 2011, I served the within NOTICE OF SECURITY INTEREST IN RENTS AND PROFITS on all interested parties in this proceeding by placing true and correct copy thereof enclosed in a sealed envelope with postage prepaid in the United States Mail at Woodland Hills, California, addressed as follows:

John DeHart Wollstein
2415 Ala Wai #1901
Honolulu, HI 96815
Debtor

Steven Guttman, Esquire
Kessner Duca Umebayashi Bain & Matsunaga
220 South King Street, Suite 1900
Honolulu, HI 96813
Attorney for Debtor

Curtis B. Ching, Esquire
Office of the U.S. Trustee
1132 Bishop Street, Suite 602
Honolulu, HI 96813
Attorney for the U.S. Trustee

      I declare that I am employed in the office of a member of the Bar at whose direction this service was made.

      I certify under penalty of perjury that the foregoing is true and correct.

      Executed on April 20, 2011 at Woodland Hills, California.


      <u>/s/ Tina Gaboyan</u>

U.S. Bankruptcy Court - Hawaii   #11-00098   Dkt # 56   Filed  04/20/11   Page 3 of 31

Prepared by: JOSHUA HILL

**COUNTRYWIDE HOME LOANS, INC.**

DATE: 07/19/2007
BORROWER: JOHN DEHART WOLLSTEIN
CASE #:
LOAN #:
PROPERTY ADDRESS: 91-005 PARISH DR
           EWA BEACH, HI 96706-2513

Branch #: 0006153
2595 W. CHANDLER BLVD
CHANDLER, AZ 85224
Phone: (480)224-4613
Br Fax No.: (480)855-2495

## HOME EQUITY CREDIT LINE AGREEMENT
## AND DISCLOSURE STATEMENT

Date: 07/19/2007

This Home Equity Credit Line Agreement and Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you,

COUNTRYWIDE HOME LOANS, INC.
The words "I," "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and together. The words "you" and "your" refer to

COUNTRYWIDE HOME LOANS, INC.

**1. LOANS: DRAW AND REPAYMENT PERIOD.** Subject to the limitations explained in this Agreement, upon my request for loans, you agree to lend money to me from time to time until the last day of the sixtieth (60th) consecutive calendar month following the date set forth above ("Initial Draw Period,") or until the last day of any renewed Draw Period, up to my Credit Limit indicated in paragraph 5 below. (You will not make any loans if my Account is sooner terminated or suspended under paragraphs 12.B, 12.D, 13.B or 17 below.) You will not make any loan before the fourth business day following the signing of this Agreement.

I agree that prior to the end of the Initial Draw Period, you have the right to review my Account to decide whether such Initial Draw Period will be renewed. Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided not to renew such Initial Draw Period, such Initial Draw Period will automatically renew for one additional sixty (60) month period, and the Draw Period on my Account shall thereafter be considered to be 120 months for purposes of this Agreement. If the Initial Draw Period is not renewed, then the Draw Period on my Account shall thereafter be considered to be 60 months for purposes of this Agreement.

After the Draw Period ends, I will no longer be able to obtain loans and then must pay the outstanding balance over the specified Repayment Period unless my Account is sooner terminated under paragraph 13.B below, in which case my Account is due and payable in full at the time of such termination. The Repayment Period shall be 180 months.

**2. MAKING LOANS.** You will make loans under this Agreement (up to my Available Credit Limit) by (i) honoring Equity Credit Line Checks you provide to me requesting advances of at least $250; (ii) if you issue an access card ("Card"); by honoring advances I request by using the Card at any Merchant or servicer provider ("Merchant") or any participating automated teller ("ATM") networks; (iii) paying closing costs and finance charges in accordance with paragraph 8.C below; (iv) paying certain other amounts on my behalf in accordance with my disbursement authorization provided to you at or before the time I sign this Agreement; (v) paying any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement or the Mortgage; or (vi) any other method or procedure you establish.

**3. SPECIAL CARD TERMS AND CONDITIONS.** I understand that you, in your sole discretion and at your sole option, may cause to be issued a Card, as an access device and an additional means by which I may obtain advances under the Account. By applying for the Account, I have requested that you issue the Card to me if my application is approved and if you, at your option and in your sole discretion, provide access to my/our Account by the Card after the Account is opened. If one or more Cards are issued to me as a means of obtaining loan advances on my Account, I agree that my use of the Card and any related loan advances will be governed by the following terms and conditions **unless I cancel my card within [30] days of receiving the Card and have not authorized the use of the Card or Card account number.** I also agree to comply with any agreement between me and the Card Issuer.

    A. <u>Account Access.</u> In addition to any means by which I may access my Account as described in the Agreement, I may be permitted to obtain (up to my Available Credit Limit) loan advances by using any Card you provide, at any merchant or service provider ("Merchant") that allows me to use the Card to pay for goods or services. If you provide me with a Personal Identification Number ("PIN"), I may also obtain loan advances by using the Card at participating automated teller machine ("ATM") networks. I agree not to write my PIN on my Card(s) or disclose it to others. If I use my Card at an ATM, I understand that the owner of the ATM may charge me a fee for the transaction. I understand that in order to use my Card at an ATM, I must call 1-800-669-5864 to request a PIN. I also understand that Card loan advances (whether at a Merchant or ATM) may be subject to transactional limits that could restrict the full use of my Available Credit Limit. There are no minimum draw requirements that apply when I use the Card, except for

● HELOC - HI Agreement and Disclosure Statement
2D100-HI (12/05)(d)





U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 4 of 31

Exhibit A

any limits that may be imposed separately by a Merchant or ATM owner. I agree that if you decide in your sole discretion to approve any transactions above my Available Credit Limit, I will be responsible for the full amount of any such advances. I understand that if I make reservations or purchases of any kind using my Card, my Account may be immediately charged for the full amount of the reservation or purchase, regardless of whether I have received the goods or services requested at the time my Account is charged.

B. Liability. I agree that all borrowers who have executed the Agreement are jointly and severally liable under the terms of the Agreement for any Card transactions that are posted to the Account, whether or not a Card has been issued to all borrowers.

C. Authorizations. All Card transactions are processed through the applicable bankcard networks that are branded on the Card ("Bankcard Networks") according to the requirements and procedures of the Bankcard Networks. Some Card transactions may require prior authorization by you or pursuant to the requirements and procedures of the Bankcard Networks before they are approved for processing. The Bankcard Networks may refuse to process any Card transaction if it appears to be illegal or fraudulent, or if the Merchant or the transaction does not otherwise meet the requirements of the Bankcard Networks. In addition, you or the Card Issuer may deny authorization for any Card transaction if my Account has been suspended or terminated. I also agree that if you or the Card Issuer detects any suspicious or unusual use, you or the Card Issuer may suspend use of any Card.

D. Lawful Transactions. I agree to use my Card only for valid and lawful purposes. If I use my Card for any other purpose or transaction (herein called a "Prohibited Activity"), including, without limitation, gambling activities, I agree to promptly reimburse you, the Card issuer (if other than you) and the Bankcard Networks for all amounts or expenses paid by any such party as a result of such use. You reserve the right to block any Prohibited Activity and/or to not approve any authorization request for a Prohibited Activity. Card transactions for any Prohibited Activity made by me or for my benefit shall be considered authorized by me. You will not be liable if I engage in any Prohibited Activity using the Card, and I will be responsible for the full amount of any loan advances made in connection with such Prohibited Activity. Display by an online merchant of the service mark of any Bankcard Network branded on the Card does not mean that a Card transaction over the Internet is legal where I reside.

E. Transactions With Merchants. I understand and agree that: (1) If a Merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", "all sales final", or similar language, I will be bound by that policy when I use my Card to pay for goods or services from that Merchant; (2) When using my Card to make travel or lodging reservations, I must obtain the Merchant's cancellation policy and follow it if I cancel the reservations. If I cancel, I must obtain the cancellation number that the Merchant is required to give me pursuant to the requirements and procedures of the Bankcard Networks. The Merchant may charge me for a cancelled transaction unless I can provide you with a correct cancellation number. (3) If I authorize a Merchant to charge repeat transactions to my Account without my presenting my Card for each charge, then I must notify the Merchant when I want to discontinue the repeat transactions or if my Account is suspended or closed. Otherwise, I will be responsible to you for the amount of all such repeat transactions. I understand that if my loan advance privileges or my use of the Card is suspended or cancelled for any reason, it is my responsibility to pay for such repeat transactions directly until loan advance privileges and/or Card use are reinstated. (4) If I disagree with any transaction on my monthly statement or have a dispute with any Merchant as a result of a Card transaction, I agree to comply with the section entitled MY BILLING RIGHTS – I SHOULD KEEP THIS NOTICE FOR FUTURE USE in my Agreement. I will promptly provide you with such information or assistance as you reasonably request.

F. Foreign Transactions. I agree to pay you in U.S. dollars. If I make a Card transaction in a foreign currency, the appropriate Bankcard Network will convert the transaction amount into U.S. dollars at the rates, and in accordance with its operating regulations in effect at the time the transaction is processed. Currently, the regulations of the Bankcard Networks provide that the currency conversion rate to be used is either a wholesale market rate selected by the Bankcard Networks or a government-mandated rate, each in effect one day prior to the processing date, plus an adjustment factor (currently 1%) established by the Bankcard Networks. The Bankcard Networks may change the currency conversion rate, and the formula used to establish that rate, from time to time. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date. The currency conversion rate used may be the same as, greater than or less than the amount that would be calculated by conversion through a financial institution in the country in which the transaction occurred. I understand that you do not determine the currency conversion rate or the formula to establish the rate that is used by the Bankcard Networks and that you do not receive any portion of the currency conversion rate used by the Bankcard Networks.

G. Limitation of Liability. Your liability to me, if any, for wrongful dishonor of any loan request I make using my Card is limited to my actual damages. I also agree that you are not responsible if any transaction is not approved, whether by you, a Merchant, Bankcard Network, or a third party, even if I have sufficient credit available.

H. Termination/Suspension of Account. Upon any termination or cancellation of my Account by you or by me, or any suspension of my loan advance privileges under the Agreement, I agree that all Cards will be destroyed by me upon your instruction, or may be retrieved by you or your agent.

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 5 of 31

I. Cancellation/Expiration of Cards. I may be permitted to use the Card to access my account only so long as the access card program remains active and you permit me to participate in the program. If more than one person has executed the Agreement, any one of us may request that our Cards be cancelled. The request, at your option, may be made verbally or in writing. You may also cancel any Card at your sole discretion at any time, including if (1) the contracts with current or future providers of services used to operate the Card program expire or are terminated; or (2) I have not used my Card to obtain a loan advance on my Account at least once during any 12 month period; (3) my card is lost, stolen, or otherwise subject to unauthorized use; or (4) any part of the Program, including use of the Card, is prohibited by applicable law. I understand and agree that the terms governing my ability to obtain loan advances during the Initial Draw Period and any renewed Draw Period are set forth in the Agreement and that those terms supercede any inconsistent expiration date(s) printed on any Cards that are issued to me to the extent that such expiration date(s) is (are) later than the expiration date of any Draw period defined in the Agreement.

J. Lost or Stolen Cards. I agree to promptly notify you at 1-800-556-5678 if any Card is lost or stolen, or if I suspect unauthorized use. You reserve the right not to honor any loan advance request made using a Card if any of my Cards has been cancelled or reported lost or stolen.

K. Unauthorized Transactions. I will not be liable for the unauthorized use of my Card. I agree to assist you in your investigation of any claims of unauthorized Card transactions and understand that I may be required to provide you with a written statement and/or an Affidavit of Forgery. I agree that if I permit a person to use the Card or Card account number, or if I benefit from another person's use of the Card or Card account number, such use is not unauthorized use of the Card, even if I did not intend to be responsible for such use.

L. Special Rule for Card Purchases. The following is in addition to the notice at the end of the Agreement entitled MY BILLING RIGHTS – I SHOULD KEEP THIS NOTICE FOR FUTURE USE:

**Special Rule for Card Purchases.**

If I have a problem with the quality of property or services that I purchased with my Card, and I have tried in good faith to correct the problem with the merchant, I may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a)  I must have made the purchase in my home state or, if not within my home state, within 100 miles of my current mailing address; and

(b)  The purchase price must have been more than $50. These limitations do not apply if you or the Card Issuer own or operate the merchant, or if you or the Card issuer mailed me the advertisement for the property or services.

## 4. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.

A. I promise to pay to your order, when and as due, all loans made under this Agreement, plus all unpaid finance charges, insurance premiums, collection costs and other charges I owe to you now or in the future. I agree to make my payments in the manner specified in my periodic statement, and if I do so such payments will be credited as of the day of receipt.

B. At a minimum, you will send me a periodic statement at the end of each billing cycle in which there is a debit or credit balance of more than one dollar ($1.00) or in which a finance charge has been imposed. The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance," my Annual Percentage Rate, the amount of my "Minimum Payment Due," my "Payment Due Date" and the place and manner of making payments.

C. I may pay all or any part of my "New Balance" at any time, without penalty. As periodic finance charges will accrue on my Account balance until it is fully repaid, any periodic finance charges incurred for the billing cycle in which full payment of the New Balance shown on the previous periodic statement is received by you will be reflected on my next periodic statement. If I want to include those finance charges with the payment of the New Balance shown on my previous periodic statement, I will contact
COUNTRYWIDE HOME LOANS, INC.
P.O. Box 10287, Van Nuys, CA 91419-0287
for details concerning the amount I must include.

D. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 13.B below, I must pay you at least the "Minimum Payment Due" for each billing cycle by the "Payment Due Date" shown on my periodic statement.

E. During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." My "Minimum Payment Due" during the Draw Period will not reduce the principal balance that is outstanding on my account.

F. During the Repayment Period, if the Draw Period on my Account is 60 months or 120 months, my "Minimum Payment Due" equals 1/180th of the outstanding principal balance of my Account as of the last day of the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." If the Draw Period on my Account is 36 months, my "Minimum Payment Due" during the Repayment Period equals 1/120th of the outstanding principal balance of my Account as of the last day of

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 6 of 31

the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due."

**5. CREDIT LIMIT.** My Credit Limit under this Agreement is $ 76,000.00 . I promise not to request a loan which will cause the unpaid principal balance of my Account to exceed my Credit Limit. You can increase the Credit Limit at any time without prior notice to me. You can refuse to make loans that cause my obligations under this Agreement to exceed my Credit Limit. You will make loans on my Account based on the "Available Credit Limit" shown on my most recent periodic statement. However, I agree that when I make payments on my Account by check or other non-cash method, you reserve the right to make loans based on the "Available Credit Limit" shown on the last periodic statement issued prior to the most recent periodic statement. In addition to each "Minimum Payment Due," I must pay immediately, without notice or demand from you, any part of the principal balance of my Account that exceeds my Credit Limit.

**6. ANNUAL PERCENTAGE RATE.**

☐ A. The initial Daily Periodic Rate is N/A %. The initial **ANNUAL PERCENTAGE RATE** is N/A %. These rates are "discounted" rates. This means that these rates are lower than the rates that would be in effect if the formula set forth in paragraph 6.C below had been used, in which event the initial Daily Periodic Rate would be N/A % and the initial **ANNUAL PERCENTAGE RATE** would be N/A %. These discounted rates will be in effect from the date of this Agreement until N/A . Thereafter, the Daily Periodic Rate and the Annual Percentage Rate will be determined using the formula set forth in paragraph 6.C below.

☒ B. The initial Daily Periodic Rate is 0.03014 % and the initial **ANNUAL PERCENTAGE RATE** is 11.000 %. These rates are not discounted.

C. My Annual Percentage Rate and Daily Periodic Rate may increase or decrease (the first day after my "discounted" rate has expired, if applicable) according to the following procedure: The **ANNUAL PERCENTAGE RATE** shall be the "Index" plus a "Margin". The "Index" will be the highest Prime Rate as published in the "Money Rates" table of The Wall Street Journal as of the first business day of the calendar month. The "Margin" is equal to the number of percentage points disclosed in paragraph 6.D below. Each billing cycle will end on the last day of the calendar month. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index value is established.

Upon a change in the Index, any resulting change in my Daily Periodic Rate and Annual Percentage Rate will take effect without prior notice to me, and will apply to new loans and to the outstanding principal balance in my Account. The new Annual Percentage Rate and Daily Periodic Rate will apply to my then existing unpaid principal balance and all new loans I obtain until my Annual Percentage Rate and Daily Periodic Rate change again. The Daily Periodic Rate at any time equals the **ANNUAL PERCENTAGE RATE** divided by 365.

D. The "Margin" to be used under paragraph 6.C above to determine my **ANNUAL PERCENTAGE RATE** is 2.750 %.

E. The Annual Percentage Rate is a simple interest rate. The Annual Percentage Rate includes only interest and no other costs. The **ANNUAL PERCENTAGE RATE** will never increase above 18.000 % or the maximum rate permitted by law, whichever is less.

F. If the Daily Periodic Rate (and the corresponding Annual Percentage Rate) increases, I will have to pay additional periodic finance charges and, as a result, I will have to pay larger "Minimum Payments."

**7. FINANCE CHARGE.** I agree to pay finance charges on my Account as explained below.

A. Periodic **FINANCE CHARGE.**

(1) A loan represented by an Equity Credit Line Check will be posted to my Account on the date that such a check is presented to you for payment. Any loan advance represented by a Card transaction will be posted to my Account as of the date that you receive the transaction for processing. The periodic finance charge begins to accrue on my Account from the time a loan is posted to my Account. There is no grace period during which I can repay loan advances without incurring a periodic finance charge.

(2) You compute the periodic finance charge on my Account by applying the Daily Periodic Rate to the "Average Daily Balance" in my Account (including current transactions). To determine the periodic finance charge for any billing cycle, the "Average Daily Balance" is multiplied by the Daily Periodic Rate, then this product is multiplied by the number of days in the billing cycle.

(3) To get the "Average Daily Balance," you take the beginning principal balance of my Account each day, add any new loans and subtract any principal payments or credits. This gives you the Daily Balance. Then you add up all the Daily Balances for the billing cycle and divide by the total number of days in the billing cycle. This gives you the "Average Daily Balance."

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 7 of 31

B. Other **FINANCE CHARGES.**

(1) Points **FINANCE CHARGE.**

I agree to pay a Points **FINANCE CHARGE** of $ 0 . 0 0      at the time I sign this Agreement.

| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |

(2) Broker Fee **FINANCE CHARGES.**

I agree to pay Broker Fee **FINANCE CHARGES** of $ N/A      at the time I sign this Agreement.

| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |

(3) Settlement Agent **FINANCE CHARGES.**

I agree to pay the following Settlement Agent **FINANCE CHARGES** at the time I sign this Agreement:

| | |
|---|---|
| Sub Escrow/Full Escrow | $ 0.00 |
| Closing/Escrow | $ 366.49 |
| document preparation to hirai lum title | $ 141.36 |
| notary fees to title | $ 30.00 |
| lien/fs report to hawaii title | $ 52.36 |
| Messenger Fee | $ 30.00 |

(4) Annual Maintenance Fee **FINANCE CHARGES.**

[ x ]   I agree to pay an annual maintenance fee **FINANCE CHARGE** of $ 75.00      which you will charge to my Account on the first anniversary of this Agreement and every anniversary date thereafter, whether or not I have used or continue to use my Account; except that such fee shall be waived for the entire term of this Agreement if I meet both of the following conditions: (a) I maintain an average outstanding daily balance which does not fall below $ 20,000.00      from the date of this Agreement through the first anniversary of this Agreement; and (b) I make each monthly payment during that period on or before the due date for each such payment. You will not rebate any portion of the annual fee if my Account is terminated or suspended before the end of any annual period.

[   ]   I will not be charged an annual maintenance fee **FINANCE CHARGE** on this loan.

**8. OTHER CHARGES.**
     A. I agree to pay each of the charges listed below, which shall constitute additional indebtedness under this agreement. Any charges assessed will be shown on my periodic statement for the billing cycle in which such charge is assessed:

     (1) If I fail to make my "Minimum Payment Due" within ten (10) days of the "Payment Due Date," I agree to pay a late fee of 5% of the late payment.

     B. I agree to pay you or my broker the following closing costs at or before the time I sign this Agreement:

| | |
|---|---|
| Credit Report Fee | $ 35.00 |
| Title Ins/ALTA Policy | $ 292.80 |
| Recording | $ 75.00 |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| | $ _____ |
| LESS Amounts Paid by Lender | $ 0.00 |
| Total Paid by Borrower | $ 1,048.01 |

U.S. Bankruptcy Court - Hawaii   #11-00098   Dkt # 56   Filed 04/20/11   Page 8 of 31

C. I may elect to pay the closing costs described in paragraph 8.B above and the finance charges described in paragraph 7.B above in cash or by check at or before the time I sign this Agreement or I may elect to finance some or all of such costs and finance charges by allowing you to make a loan under my Account to pay some or all of such costs and finance charges.

**9. PROPERTY SECURITY.** To secure the payment of all loans I obtain and the performance of all promises I make in this Agreement, I and all co-owners are giving you a Mortgage, Security Agreement and Financing Statement (the "Mortgage") covering my dwelling located at 91-005 PARISH DR, EWA BEACH, HI 96706-2513 (the "Property"). The Mortgage is security for my current and future obligations under this Agreement. I will continue to be obligated to make payment to you under this Agreement even if the Property is damaged or destroyed and whether or not any insurance proceeds are available.

**10. SECTION INTENTIONALLY OMITTED.**

**11. PROPERTY INSURANCE.** I agree to obtain and maintain property insurance against loss or damage to the Property, in such amounts, against such risks (including, but not limited to, windstorm and hurricane hazards, and flood damage insurance required by law), and according to such terms as you may require in the Mortgage or otherwise. I may obtain property insurance from any company of my choice that is acceptable to you. If the amount of the premiums for property insurance increases at any time during the term of my Account, I agree to pay any such increase(s).

**12. YOUR RIGHTS TO TEMPORARILY SUSPEND MY LOANS OR REDUCE MY CREDIT LIMIT.**

    A. You may take the actions listed in paragraph 12.B below during the period that any of the following events or conditions occur:

        (1)    the value of the Property declines significantly below its appraised value for the purposes of my Account;

        (2)    you reasonably believe that I will not be able to meet the repayment requirements under my Account due to a material change in my financial circumstances, such as the filing of a bankruptcy petition by or against me;

        (3)    I am in default of any material obligation of this Agreement, such as my important obligations listed in paragraph 14 below;

        (4)    government action (such as enactment of a state usury law) prevents you from imposing the Annual Percentage Rate provided for in this Agreement;

        (5)    government action (such as imposition of a tax lien) impairs the priority of the lien of the Mortgage such that the value of the lien of the Mortgage is less than 120% of my Credit Limit;

        (6)    the maximum Annual Percentage Rate set forth in paragraph 6.E above is reached;

        (7)    the creditor is notified by its regulatory agency that continued advances constitute an unsafe and unsound practice.

    B. During the period in which a condition described in paragraph 12.A above occurs, you may refuse to make any additional loans or reduce my Credit Limit or do both. You will mail or deliver written notice to me after you suspend my Account or reduce my Credit Limit and this notice will describe the specific reasons for your action. You are obligated to reinstate my credit privileges when the condition(s) which caused the suspension or reduction have been cured or have changed, provided I have notified you in writing, explaining in detail and documenting how the condition(s) have been cured or have changed and no new condition(s) under paragraph 12.A above or 13.A below have occurred.

    C. Before reinstating my right to obtain loans, or restoring my Credit Limit, you may conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) as you deem appropriate, and you may require me to reimburse you on demand for any costs you actually incur for obtaining credit reports and appraisals. You may take these steps to verify that (i) the condition(s) that caused your suspension of my loans or reduction of my Credit Limit no longer exist, and (ii) the priority of the lien of the Mortgage is not impaired.

    D. If more than one Borrower signs this Agreement and any such Borrower requests that you cease making loans, you may comply with such a request. All Borrowers who have signed this Agreement must join in any request to reinstate the loans for such request to be effective. If all such persons subsequently request reinstatement of the loans, you must honor such a request unless a condition listed in paragraph 12.A above or 13.A below has occurred.

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 9 of 31

E. If an event or condition described in paragraph 12.A above occurs which is also an event or condition described in paragraph 13.A below, your rights and remedies described under paragraph 13.B below apply and supercede your rights described in this paragraph 12.

## 13. YOUR RIGHTS TO TERMINATE AND ACCELERATE MY ACCOUNT AND TAKE OTHER ACTION.

A. You may take the actions listed in paragraph 13.B below if any of the following events or conditions occur:

    (1)    I fail to meet the repayment terms of this Agreement, such as my failure to make any Minimum Payment Due to you on or before the Payment Due Date;

    (2)    I engage at any time in fraud or material misrepresentation in connection with my Account, whether in any application, in this Agreement or in the Mortgage;

    (3)    I sell or transfer title to the Property without first obtaining your written permission (also, see paragraph 19.N below);

    (4)    I fail to maintain insurance on the Property as required under this Agreement or the Mortgage;

    (5)    I act or fail to act and as a result a lien senior to the lien of the Mortgage is filed against the Property;

    (6)    I die and I am not survived by another person obligated as a Borrower under this Agreement;

    (7)    All or part of the Property is taken through eminent domain, condemnation or similar government taking;

    (8)    A prior lienholder on the Property begins foreclosure under its security document;

    (9)    The Property is used for an illegal purpose which could subject the Property to seizure;

    (10)    I fail to pay taxes on the Property; or

    (11)    My action or inaction adversely affects the Property or your rights in the Property. Such action or inaction could include, for example, the following:

        (a)    A judgment is filed against me;

        (b)    I commit waste or otherwise destructively use or fail to maintain the Property;

        (c)    I die and I am not survived by another person obligated as a Borrower under this Agreement; or

        (d)    I move out of the Property.

B. If an event described in paragraph 13.A above occurs, subject to any notice or other limitation of applicable law, you may do any combination of the following things:

    (1)    you may terminate any of my rights under my Account;

    (2)    you may temporarily or permanently refuse to make any additional loans;

    (3)    you may declare all sums owing under this Agreement and any other agreement I have made with you to be immediately due and payable;

    (4)    you may foreclose the Mortgage;

    (5)    you may reduce my Credit Limit; and

    (6)    you may take any other action permitted by this Agreement, by law or in equity.

**14. SALE OF PREMISES:** I will not sell, transfer ownership of, mortgage, or otherwise dispose of my interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises, or transfer possession, whether by lease, rental, or otherwise, or discontinue to use the Premises as my primary and/or personal residence without your prior written consent.

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 10 of 31

**15. MY IMPORTANT OBLIGATIONS.** I agree that:

   A.   I will pay all of my existing and future debts to you under any existing or future agreement with you and I will pay all of my existing and future debts to my other creditors as they become due and will not allow a creditor to obtain a judgment against me.

   B.   I will not permit any person or entity to levy upon, attach, garnish or otherwise take any money, account or other property in your possession that belongs to me.

   C.   From time to time, if requested, I will supply you with current financial information about me.

   D.   I have not made and will not make any misrepresentation in connection with my Account whether in my application, in this Agreement, or in the Mortgage.

   E.   I will not permit a receiver, sequestrator, liquidator, trustee, guardian, conservator or other judicial representative to be appointed for me or any of my property or for the Property.

   F.   I will not use or allow use of the Property for any illegal purpose.

   G.   I will not move out of the Property.

   H.   I will not permit a lien to be filed which takes priority over the Mortgage for future advances made under this Agreement.

   I.   I will not break any promise made in this Agreement or in the Mortgage such as:

      (1)   my promise not to exceed my Credit Limit; and

      (2)   my "Important Obligations" listed in the Mortgage.

**16. COSTS OF COLLECTION.** Subject to any limits of applicable law, I must pay for your reasonable and actual costs of collection, or foreclosure such as your court costs and reasonable attorney's or trustee's fees. Periodic finance charges will continue to accrue at the rates provided in this Agreement before and after I default and before and after you obtain a judgment against me, subject to applicable law.

**17. MY RIGHTS TO TERMINATE MY RIGHTS TO OBTAIN LOANS.**

   A. Termination by Me. I may terminate my right to obtain loans by sending you a written notice which will become effective upon receipt by you. If more than one person signs this Agreement as Borrower, my right to obtain loans may be terminated by written notice pursuant to this paragraph 17.A signed by any one or more of such persons. I may also suspend my right to obtain loans pursuant to paragraph 12.D above.

   B. Termination by You. My right to future advances under my Account will terminate at the end of the Draw Period or any renewed Draw Period if not sooner upon your exercise of your termination or suspension rights under paragraphs 12.B or 13.B above or my exercise of my suspension or termination rights under paragraphs 12.D or 17.A above.

   C. Effect of Termination. Upon termination or suspension of my Account, whether by you or by me, I must continue to pay the "Minimum Payment Due" on or before my "Payment Due Dates" until all amounts owed to you under this Agreement are paid in full. However, I may be required to repay all my obligations to you immediately if you exercise your rights under paragraph 13.B above. I must return unused Equity Credit Line Checks to you upon termination.

**18. CHANGES TO AGREEMENT.**

   A. You may change this Agreement to the extent not prohibited by federal or state law, such as the changes listed as follows:

      (1)   if the original Index is no longer available, you may change the Index and Margin;

      (2)   you may make any change I agree to in writing;

      (3)   you may make a change which is unequivocally beneficial to me, such as offering me more minimum payment options, extensions or renewals of my Account, reductions in the rate or fees, and additional means to access loans; and

      (4)   you may make insignificant changes, such as changing the address to which payments must be sent, name changes, operational changes involving the billing cycle date, the date the Minimum Payment is due, the day of the month on which Index values are measured to determine my rate, your rounding rules and the balance computation method.

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 11 of 31

B. If required by applicable law, you will mail me notice of such a change before the effective date of the change. The change will be effective as to any existing unpaid balance and as to any future transactions under this Agreement.

## 19. OTHER PROVISIONS.

A. Third Parties. This Agreement obligates me and my estate, heirs and personal representatives. This Agreement benefits you and your successors and assigns. You may add or release parties, or permit the addition or substitution of real property collateral that secures this Agreement, or modify, extend or amend this Agreement without in any way affecting my or any non-borrower co-owner's obligations under this Agreement. My rights under this Agreement belong only to me, I cannot transfer or assign them to anyone else. You may transfer and assign your rights and obligations under this Agreement and the Mortgage at any time without my consent.

B. Additional Credit Reports and Appraisals. I authorize you to conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) concerning me, the Property and the Mortgage as you may deem necessary from time to time. I will cooperate in having the Property reappraised.

C. Tax Deductibility. I know that I should consult a tax adviser regarding the deductibility of interest and charges.

D. Applicable Law. I agree that this Agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the Property is located.

E. Application of Payments. You may apply payments and proceeds of the Property in such order as you shall deem advisable or as otherwise required by applicable law.

F. Failure to Perform. If I violate or fail to perform any term or condition of this Agreement (or the Mortgage), you may (but are under no obligation to) perform on my behalf. All costs you incur will be added to the unpaid principal of my Account and finance charges will be figured at the rates described above. I agree to pay these costs and finance charges on demand. Your performance of any of my obligations will not be a waiver of any of your rights or remedies under this Agreement.

G. Waiver of Jury Trial. I waive my right to a jury trial.

H. Complete Understanding of the Parties. There are no oral agreements concerning this Agreement. This Agreement will not be amended or modified orally. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in effect.

I. Waiver of Notice. I waive presentment, demand, protest, notice of default, nonpayment, partial payments and all other notices and formalities in connection with the delivery, acceptance, performance, default or enforcement of this Agreement, except those notices that are required by federal Regulation Z.

J. Meaning of Words. All words in this Agreement will be read to be of such gender and number as the context may require. The section headings in this Agreement are for convenience and do not limit or amend any of the Agreement's provisions. Any list of conditions or events in this Agreement preceded by the phrase "such as" is not intended as a full or comprehensive list, but merely as a set of examples of such conditions or events. Other conditions or events are intended to be included to the fullest extent permitted under federal and state law, even if different from the listed conditions or events.

K. Payment Marked "Payment in Full". I agree not to submit any checks to you in payment of my Account marked "Payment in Full" or similar wording unless the amount of the check is equal to the total amount then owing on my Account. If I do submit a check to you marked "Payment in Full" or similar wording for a sum less than the total amount then owing on my Account, you may accept it in partial payment of my Account but will not be bound by the "Payment in Full" or similar notation. **Communications concerning a dispute as to amounts owing on my Account, including any checks submitted to you as full satisfaction of my Account, must be sent to** COUNTRYWIDE HOME LOANS, INC. P.O. Box 5170, Simi Valley, CA 93062-5170

L. Enforcement. You can accept any late or partial payment or otherwise waive or delay enforcing your rights under this Agreement and still exercise your rights at a later time.

M. <u>Notices</u>. Except for any notice required under applicable law to be given in another manner, (a) any notice to me provided for in this Agreement shall be given by delivering it or by mailing such notice to me by regular first class mail, addressed to me at my last address appearing on your records or at such other address as I may designate by written notice to you as provided in this paragraph 19.M and (b) any notice to you provided for in this Agreement shall be given by mailing such notice to you by certified mail, return receipt requested, at
COUNTRYWIDE HOME LOANS, INC.
P.O. Box 5170, Simi Valley, CA 93062-5170
or to such other address as you may designate by written notice to me as provided in this paragraph 19.M.

N. <u>Sale or Transfer of Property</u>. I understand that one of the provisions of the Mortgage states: If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

O. <u>Riders/Addenda</u>. The covenants and agreements of each of the riders/addenda checked below are incorporated into and supplement and amend the terms of this Agreement.

| | |
|---|---|
| ☐ No Cost Addendum | ☐ _____ Rider |
| ☒ Fee _____ Addendum | ☐ _____ |
| ☒ Billing Rights Statement | |

BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THIS AGREEMENT INCLUDING ANY RIDERS/ADDENDA, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING ANY TERMS AND CONDITIONS LISTED IN ANY RIDERS/ADDENDA, AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT AND ANY RIDERS/ADDENDA. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME EQUITY LINE OF CREDIT", THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE" AND TWO COPIES OF THE HOME EQUITY LINE OF CREDIT NOTICE OF RIGHT TO CANCEL.

Borrower: JOHN DEHART WOLLSTEIN      Date

Borrower:      Date

Borrower:      Date

Borrower:      Date

U.S. Bankruptcy Court - Hawaii   #11-00098   Dkt # 56   Filed 04/20/11   Page 13 of 31

# FEE ADDENDUM TO HOME EQUITY CREDIT LINE AGREEMENT AND DISCLOSURE STATEMENT

This Addendum amends and supplements and is incorporated into the Home Equity Credit Line Agreement and Disclosure Statement ("Agreement") dated JULY 19, 2007 entered into between me and the Lender identified in the Agreement. Capitalized terms used in this Addendum have the same meanings as given to them in the Agreement. The words "I" and "my" refer to the Borrower or Borrowers signing the Agreement and this Addendum.

Section 7.B , Other **FINANCE CHARGES**, of the Agreement is amended by replacing subparagraphs (1) (2) and (3) with the following and renumbering, as applicable, the remaining subparagraphs.

B. Other **FINANCE CHARGES.** In addition to any Finance Charges listed in the Agreement, I agree to pay the following FINANCE CHARGES at the time I sign the Agreement:

Flood Certification        $     25.00

-----------------------------------------------   -----------

Section 8.B of the Agreement is amended to read as follows:

B. In addition to any closing costs listed in the Agreement, I agree to pay the following closing costs at or before the time I sign this Agreement.

Except for the modifications described above, all terms and conditions of the Agreement remain unchanged and in full force and effect.

_____(Seal)      _____(Seal)
JOHN DEHART WOLLSTEIN
Borrower                                  Borrower

_____(Seal)      _____(Seal)

Borrower                                  Borrower

● Addendum to HELOC - Agreement & Disclosure
2E305-US (08/05)(d)             Page 1 of 1





L-752        STATE OF HAWAII
OFFICE OF ASSISTANT REGISTRAR
RECORDED
JUL 24, 2007        08:02 AM

Doc No(s) 3633152

on Cert(s) 865,125



000009701    WOLLSTEIN  JD

610                 —  001  003

/s/ CARL T. WATANABE
ASSISTANT REGISTRAR



20    1/1    Z13

---

After Recording Return To:        Mail ☐        Pickup ☐        To:

COUNTRYWIDE HOME LOANS, INC.                    Escrow No.:  23001064
MS SV-79 DOCUMENT PROCESSING                    Order No.:   00185537
P.O.Box 10423
Van Nuys, CA 91410-0423

**FHTC**

Prepared by:
    JOSHUA HILL                                 Total Pages:  14

[Space Above This Line For Recording Data]

23001064
[Escrow/Closing #]                                          [Doc ID #]

## MORTGAGE, SECURITY AGREEMENT AND FINANCING STATEMENT
### (Securing Future Advances)
MIN

    THIS MORTGAGE ("Security Instrument") is given on JULY 19, 2007        . The mortgagor is
JOHN DEHART WOLLSTEIN, HUSBAND OF MAYUMI YOSHIDA


("Borrower"). This Security Instrument is given to
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ("MERS") which is organized and existing
under the laws of Delaware, and whose business and post office address of P.O. Box 2026, Flint, MI 48501-2026,
tel. (888) 679-MERS, acting solely as nominee for
COUNTRYWIDE HOME LOANS, INC.
("Lender" or "you") and its successors and assigns. **MERS is the "Mortgagee"** under this Security Instrument.
Borrower owes Lender the maximum principal sum of
SEVENTY SIX THOUSAND and 00/100
Dollars (U.S. $ 76,000.00        ) unless Lender, with Borrower's written consent hereafter increases this

● MERS HELOC - HI Mortgage, Security Agreement and Financing Statement
1D995-HI (07/06)(d)                                        Page 1 of 10



* 2 3 9 9 1 *



amount. Advances made by Lender to protect the security of this Security Instrument or to preserve the Property shall not be subject to the limitation of the preceding sentence. This debt is evidenced by a revolving credit agreement dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on JULY 15, 2032 . This Security Instrument secures to Lender or order: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 6 to protect the security of this Security Instrument or to preserve the Property or pursuant to the terms hereof; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note or contained in any other agreement, instrument or writing to which Borrower is a party if the same is written in connection with any of the foregoing. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in

HONOLULU , Hawaii:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: LOT 739, AREA 7,144.0 which has the address of
91-005 PARISH DR, EWA BEACH
[Street, City] Tax Map Key: (1)9-1-007-037
Hawaii 96706-2513 ("Property Address");
[Zip Code]

The property described in Certificate Number _____ , recorded on _____ , in book _____ , at page _____ , as instrument number _____ , in the official records of the Land Court, _____. County, Hawaii.

    TOGETHER WITH all the improvements now or hereafter erected on the Property, and all easements, appurtenances, and fixtures now or hereafter a part of the Property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    WE UNDERSTAND and agree that MERS is a separate corporation acting solely as nominee for Lender and Lender's successors and assigns, and holds only legal title to the interests granted by us in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing or canceling this Security Instrument.

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 16 of 31

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record as of the date of this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record as of the date of this Security Instrument.

Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraph 1 shall be applied in such order as Lender deems advisable.

**3. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument other than the first lien of record on the date this Security Interest is signed, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**4. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance and including a residential windstorm-hurricane hazards insurance policy. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 6.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of the payments. If under paragraph 20, the Property is acquired by Lender, Borrower's right to any insurance policies and

U.S. Bankruptcy Court - Hawaii  #11-00098   Dkt # 56   Filed  04/20/11   Page 17 of 31

proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

5. **Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 17, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note including, but not limited to representations concerning whether Borrower occupied the Property. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

6. **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 6, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 6 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

It is agreed that the Lender shall be subrogated to the claims and liens of all parties whose claims or liens are discharged or paid with the proceeds of the Agreement secured hereby.

7. **Borrower's Obligation to Maintain the Property and to Fulfill Obligations in Leases and Mortgages and Agreements About Leases.**

(a)  **Agreements About Maintaining the Property.** Borrower will keep the Property in good repair and will not destroy, damage or change the Property, will not allow the Property to deteriorate, and will comply with all laws, rules and regulations made by all government authority applicable to the Property.

(b)  **Agreements About Keeping Promises in Leases and Mortgages.** Borrower will fulfill his/her obligations under any lease which is part of the Property and will not change or agree to any change in any lease which is a part of the Property. Borrower will fulfill his/her obligations in any mortgage on the Property listed on <u>Exhibit A</u> at the end of this Security Instrument. Borrower will not change or agree to any change in any such mortgage.

(c)  **Agreements that Apply to Leases and Preventing Rejection or Termination of Leases in Bankruptcy Cases.** If (i) the Property includes, or is under, covered, or affected by any leases (the "Property Leases"), (ii) Borrower, or anyone else with rights to and/or obligations under any Property Leases, including, but not limited to lessors, lessees, sublessors, and sublessees, become a debtor in a voluntary or involuntary bankruptcy case, and (iii) an order for relief is issued pursuant to the bankruptcy laws, <u>then</u> Borrower will take the actions necessary to prevent the Property Leases (a) from being rejected by Borrower, any bankruptcy trustee or any other person pursuant to the bankruptcy laws, or (b) from being terminated in any manner. Borrower will take such actions within five (5) days from the date of filing of the order for relief. The bankruptcy laws include, but are not limited to, Section 365 of Title 11 of the provisions of the United States Code, which is often referred to as Bankruptcy Code Section 365, as it may be amended from time to time.

U.S. Bankruptcy Court - Hawaii  #11-00098   Dkt # 56   Filed  04/20/11   Page 18 of 31

Borrower now appoints Lender as his/her attorney-in-fact to do whatever Lender believes is necessary to protect Lender's interests in the Property and to prevent the rejection or termination of the Property Leases under the bankruptcy laws. This means that Borrower now gives Lender the right, in his/her place and name, or in Lender's own name, to do whatever Lender believes is necessary to protect Lender's interests in the Property. Lender has no obligation or responsibility to look out for or take care of Borrower's interests. Lender may, but Lender does not have to, take any actions to prevent the Property Leases from being rejected or terminated pursuant to the bankruptcy laws. Those actions include, but are not limited to, the following:

(i) The filing of any instruments, documents and pleadings with the court to assume and/or assign the Property Leases; and

(ii) The filing of a notice of election to remain in possession of leased real property if the lessor becomes a debtor in a bankruptcy case and rejects Borrower's lease.

Lender's having the right to take such actions will not prevent Borrower, on his/her own, from taking any actions to protect Borrower's interests and the Property Leases.

**8. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of such payments.

**10. Borrower Not Released; Forbearance by Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 19 of 31

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent. The execution of this Security Interest by any person who does not have a present interest in the Property shall not be deemed to indicate that such an interest presently exists. Rather, execution of this Security Interest by such a person shall constitute such person's agreement that if such person hereafter acquires an interest in the Property, such interest shall be subject to Lender's interest hereunder.

**12. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**13. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**14. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

U.S. Bankruptcy Court - Hawaii  #11-00098   Dkt # 56   Filed 04/20/11   Page 20 of 31

**17. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 16.

**18. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 13 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**19. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 19, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 19, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

**20. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 16 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 20, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

U.S. Bankruptcy Court - Hawaii   #11-00098   Dkt # 56   Filed  04/20/11   Page 21 of 31

If Lender invokes the power of sale, Lender shall give Borrower notice of sale in the manner provided in paragraph 13. Lender shall publish a notice of sale and shall sell the Property at the time and place and under the terms specified in the notice of sale. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**21. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

**22. Waivers.** Borrower relinquishes all right of dower and curtesy in the Property.

**23. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider(s) | ☐ Condominium Rider | ☒ 1-4 Family Rider |
| ☐ Planned Unit Development Rider | ☐ Second Home Rider | |
| ☐ Other(s) [specify] | | |

**24. Obtaining Insurance.** THE BORROWER UNDERSTANDS THAT BORROWER MAY OBTAIN ANY INSURANCE REQUIRED HEREIN OR IN CONNECTION WITH THE LOAN SECURED BY THIS SECURITY INSTRUMENT FROM ANY INSURANCE COMPANY AUTHORIZED TO DO BUSINESS IN THE STATE OF HAWAII.

**25. Agreements that Apply to Condominiums and PUDs.**

(a) If the Property includes an apartment unit in a Condominium Project, the Owners' Association may maintain a hazard insurance policy which covers the entire Condominium Project. That policy will be called the "master policy". If the master policy insures Borrower's apartment unit as well as the common elements of the Condominium Project, so long as the master policy remains in effect and meets the requirements stated in Paragraph 4: (i) Borrower's obligation to obtain and to keep hazard insurance on the Property is satisfied; and (ii) if there is a conflict, concerning the use of proceeds, between (1) the terms of Paragraph 4, and (2) the law or the terms of the declaration, bylaws, regulations or other documents creating or governing the Condominium Project, then that law or the terms of those documents will govern the use of proceeds. Borrower will promptly give Lender notice if the master policy is interrupted or terminated. During any time that the master policy is not in effect, the terms of i and ii of this paragraph will not apply.

(b) If the Property includes a unit in a Condominium Project, it is possible that proceeds will be paid to Borrower instead of being used to repair or to restore the Property. Borrower gives Lender Borrowers' rights to those proceeds. If the Property includes a unit in a PUD, it is possible that proceeds will be paid to Borrower instead of being used to repair or to restore the common areas or facilities of the PUD. Borrower gives Lender Borrower's rights to those proceeds. All of the proceeds described in this paragraph 26(b) will be paid to Lender and will be used to reduce the amount that Borrower owes to Lender under the Agreement and under this Security Instrument. If any of those proceeds remain after the amount that Borrower owes to Lender has been paid in full, the remaining proceeds will be paid to Borrower.

**26. BORROWER'S OBLIGATION TO FULFILL AND AGREEMENTS ABOUT CONDOMINIUMS AND PUDs.**

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 22 of 31

If the Property is a unit in a Condominium Project or in a PUD, Borrower will fulfill all of his/her obligations under the declaration, bylaws, regulations and other documents that create or govern the Condominium Project or PUD, will not divide the Property into smaller parts that may be owned separately known as "partition or subdivision", will not consent to certain actions unless Borrower has first given Lender notice and obtained Lender's consent in writing. Those actions are:

(i) The abandonment or termination of the Condominium Project or PUD, unless, in the case of a condominium, the abandonment or termination is required by law;

(ii) Any change to the declaration, bylaws or regulations of the Owners' Association, trust agreement, articles of incorporation, or other documents that create or govern the Condominium Project or PUD, including, for example, a change in the percentage of ownership rights, held by unit owners, in the Condominium Project or in the common areas or facilities of the PUD;

(iii) A decision by the Owners' Association to terminate professional management and to begin self-management of the Condominium Project or PUD; and

(iv) The transfer, release, creation of liens, partition or subdivision of all or part of the common areas and facilities of the PUD. (However, this provision does not apply to the transfer by the Owners' Association of rights to use those common areas and facilities for utilities and other similar or related purposes.)

**27. LENDER'S RIGHTS TO RENTAL PAYMENTS FROM THE PROPERTY AND TO TAKE POSSESSION OF THE PROPERTY.** As additional protection for Lender, Borrower gives to Lender all of his/her rights to any rental payments from the Property. However, until Borrower is in default, Borrower has the right to collect and keep those rental payments as they become due. Borrower has not given any of his/her rights to rental payments from the Property to anyone else, and will not do so without Lender's consent in writing.

If Borrower is in default, then Lender, persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (a) collect the rental payments, including overdue rental payments, directly from the tenants; (b) enter on and take possession of the Property; (c) manage the Property; and (d) sign, cancel and change leases. Borrower agrees that if Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this paragraph, the tenants may make those rental payments to Lender without having to ask whether Borrower has failed to keep his/her promises and agreements under this Security Instrument.

If there is a judgment for Lender in a lawsuit for foreclosure and sale, Borrower will pay to Lender reasonable rent from the date the judgment is entered for as long as Borrower occupies Property. However, this does not give Borrower the right to occupy the Property.

All rental payments collected by Lender or by a receiver, other than the rent paid by Borrower under this paragraph, will be used first to pay the costs of collecting rental payments and managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the amount that Borrower owes to Lender under the Agreement and under this Security Instrument. The costs of managing the Property may include the receiver's fees and reasonable attorneys' fees. Lender and the receiver will be obligated to account only for those rental payments that they actually receive.

**28. FINANCING STATEMENT.** This Security Instrument also serves as a financing statement to perfect the Lender's security interest in the Property.

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 23 of 31

DOC ID #:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_John DeHart Wollstein_ (signature)

JOHN DEHART WOLLSTEIN                                        -Borrower

_____        -Borrower

_____        -Borrower

_____        -Borrower

STATE OF HAWAII,      City & County Of Honolulu      ss:

On _July 20, 2007_ , before me personally appeared _____

_JOHN DeHART WOLLSTEIN_

_____

to me personally known, who, being by me duly sworn (or affirmed), did say that such person executed the foregoing instrument as the free act and deed of such person, and if applicable in the capacity shown, having been duly authorized to execute such instrument in such capacity.

My Commission Expires: **APR 2 4 2008**

(Seal)

Notary Public, State of Hawaii

FRANCISCO J. AMBRIZ

Notary Name

● MERS HELOC - HI Mortgage, Security Agreement and Financing Statement
1D995-HI  (07/06)                                    Page 10 of 10

## EXHIBIT "A"

All of that certain parcel of land situate at Puuloa, District of Ewa, City and County of Honolulu, State of Hawaii, described as follows:

Lot 730, area 7,114.0 square feet, more or less, as shown on Map 39, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 242 (amended) of The Dowsett Company;

TOGETHER WITH a right of way for pedestrian purposes only, on, over and along Lot 756, as shown on Map 39, to be used in common with others entitled thereto.

Being all of the land described in Transfer Certificate(s) of Title No. 865,125.

End of Exhibit "A"

After Recordation Return By:　Mail ☐　Pickup ☐　To:

COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared by:
JOSHUA HILL

——————————— [Space Above This Line For Recording Data] ———————————

23001064
[Escrow/Closing #]　　　　　　　　　　[Doc ID #]

## 1-4 FAMILY RIDER
### Assignment of Rents

THIS 1-4 FAMILY RIDER is made this 19th day of JULY, 2007·　　and is incorporated into and shall be deemed to amend and supplement the Mortgage, Security Agreement and Financing Statement (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note to: COUNTRYWIDE HOME LOANS, INC.
4500 Park Granada, Calabasas, CA 91302-1613
("Lender") of the same date and covering the Property described in the Security Instrument and located at:
91-005 PARISH DR, EWA BEACH, HI 96706-2513

HELOC - HI 1-4 Family Rider
1D099-HI (04/05)(d)　　　　　　　　　　　Page 1 of 3





**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. **ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances, and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

B. **USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C. **SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

D. **RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by paragraph 4.

E. **ASSIGNMENT OF LEASES.** Upon Lender's request, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph E, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

F. **CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

U.S. Bankruptcy Court - Hawaii  #11-00098  Dkt # 56  Filed 04/20/11  Page 27 of 31

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____    Borrower
JOHN DEHART WOLLSTEIN

_____    Borrower

_____    Borrower

_____    Borrower

HELOC - HI 1-4 Family
1D099-HI (04/05)                    Page 3 of 3

### CERTIFICATE OF ASSISTANT SECRETARY
### OF
### COUNTRYWIDE HOME LOANS, INC.
**a New York corporation**

April 6, 2009

The undersigned, a duly qualified and acting Assistant Secretary of Countrywide Home Loans, Inc. (the "Company"), does hereby certify as follows:

1.      That Countrywide Home Loans Servicing LP, a Texas limited partnership ("Servicing LP"), is an affiliate of the Company; and

2.      That effective November 7, 2008, the Company transferred the servicing of certain of its mortgage loans to Servicing LP pursuant to that certain Asset Purchase Agreement by and between Bank of America Corporation and the Company.

IN WITNESS WHEREOF, the undersigned has signed this Certificate of Assistant Secretary on behalf of the Company as of the date first written above.

By: _Devra Lindgren_
Devra Lindgren
Assistant Secretary

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Hope Andrade
Secretary of State

# Office of the Secretary of State

## CERTIFICATE OF FILING
## OF

### BAC Home Loans Servicing, LP
File Number: 13186910

[formerly: COUNTRYWIDE HOME LOANS SERVICING LP]

The undersigned, as Secretary of State of Texas, hereby certifies that an amendment to the certificate of limited partnership or the application for registration as a foreign limited partnership for the above named limited partnership has been received in this office and filed as provided by law on the date shown below.

Accordingly, the undersigned, as Secretary of State hereby issues this Certificate evidencing the filing in this office.

Dated: 04/21/2009
Effective: 04/27/2009



Hope Andrade
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

| | | |
|---|---|---|
| Phone: (512) 463-5555 | Fax: (512) 463-5709 | Dial: 7-1-1 for Relay Services |
| Prepared by: Lisa Sasin | TID: 10069 | Document: 254791870002 |

F I L E D
In the Office of the
Secretary of State of Texas

APR 2 1 2009

Corporations Section

## CERTIFICATE OF AMENDMENT
## TO THE
## CERTIFICATE OF LIMITED PARTNERSHIP

Pursuant to the provisions of Section 2.02 of the Texas Revised Partnership Act, the undersigned limited partnership desires to amend its Certificate of Limited Partnership and for that purpose submits the following Certificate of Amendment:

1. The name of the limited partnership is Countrywide Home Loans Servicing LP.

2. The Certificate of Limited Partnership is amended as follows:

   The name of the limited partnership is BAC Home Loans Servicing, LP.

The Certificate of Limited Partnership shall be amended, as of April 27, 2009, to reflect the above name change.

Dated: April 21, 2009

                              COUNTRYWIDE HOME LOANS
                              SERVICING LP

                              By: Countrywide GP, LLC
                              Its: General Partner

                              By: _____
                                  Jack W. Schakett
                                  President and Chief Executive Officer